Good morning. May it please the Court, my name is Natalie Landreth and I represent the Chugach, the traditional leaders of which are here with us in the courtroom. With me at council table is Mr. Rich DeBoto of DLA Piper and my colleagues from the Native American Rights Fund. I would like, if I may, to reserve ten minutes for rebuttal. Whatever we have on the clock will be yours, Ms. Landreth. Seven years ago, this Court remanded the case to the District Court to determine whether the Chugach people could establish long-term use and occupancy of the OCS. After a seven-day trial with more than 20 witnesses and 100 exhibits, including 18th century eyewitness accounts describing the Chugach themselves fishing more than 60 miles from shore, the District Court made findings that when the test is properly applied to them, established that the Chugach in fact made their case. The District Court recognized that the Chugach have always regarded themselves and been regarded by other people as one people sharing a common language and culture. And it was undisputed that for 7,000 years the Chugach hunted and fished in the areas of the OCS at issue in this case. Does the test require that the use be exclusive? The use has to be exclusive. Pardon the yes or no. Yes, Your Honor, it does. It has to be exclusive, but that other people, other Native groups entering for trade or warfare does not defeat exclusivity because that happens in every nation. Where exclusivity is defeated is where there is evidence that other people are hunting and fishing in one's territory, and there was not one piece of evidence in this case that others hunted and fished in this territory. To you, exclusive doesn't mean, or to your client, doesn't mean the ability to exclude others. It does in a sense mean the ability to exclude, but we believe the ability to exclude can be inferred from the fact that the defendant was able to provide no evidence that anyone else ever did hunt and fish in this area. It's also, if the Court is interested in looking in detail at this issue, in Exhibit 91, there is an incredibly detailed set of historical records from Baranoff from the time period of 1791 to 1800 describing how he refused to send teams of his men into this area because it was so incredibly dangerous. Counsel? Yes, sir. To Baranoff, all the natives were alike, but to the aboriginal peoples there, according to the findings of fact at page 18, excerpts 19, each village had separate, if ill-defined, hunting and fishing access. There's no evidence of sharing of fish camps, and it's more likely than not that each of the villages kept all others at arm's length and that the relations between them were generally hostile. So it looks as though the only way we can treat the native peoples of the area as having exclusive use is if we do what might be analogous for Europe if we treated the Danes, the English, the Germans, and the Swedes as all the same people. Well, I think in this case what has happened is that the they had a two-tiered ownership is probably the best way to explain it. The kind of ownership that you find in the Washington cases, the Muckleshoot, the Nisqually, where people tended to be very protective of the areas immediately surrounding their village because they didn't know who was approaching. And then they treated, and I think this was the testimony, the ocean, which is the Federal Waters in this case, as common property. Now, I think that it's interesting that the district court also found that they did engage in joint hunting and fishing expeditions and that that was probably seasonal. Well, they said this was an exception, not the norm, because I'm looking at the same page that Judge Kleinfeld referred to, the top of the page, and it doesn't, as I read that language, which is a little different from the way it is in your brief, or at least the way I read it as it was actually in your brief, but the way I read it is that occasionally there were more than one villager in the same village that would collaborate, but there's no indication at all of collaboration between villages. The joint use test doesn't require that they actually hunt and fish the areas together at the same time in a collaborative way. It requires that they're using the same area and that they're acknowledging shared use of an area. So you agree with my reading. You're saying you agree with my reading, but you think it doesn't matter. So let me get an answer to the question I actually did ask. Yes, Your Honor. Okay. So what about this language from the district court that this was the exception, not the norm? It says joined by two or more villagers, hunting, trading, raiding, et cetera, probably took place occasionally, but such joint activity was the exception, not the norm. That's the finding, and just accepting it as correct for the time being. You might argue that it's not correct, but let's just accept it for the time being. Would an exceptional use like that count? Would it be sufficient? Wouldn't it have to be the norm? The district court also has findings that their use was seasonal, and we think that establishes enough regularity in the other aboriginal rights cases to satisfy it. You're correct, of course, that the finding says that they only physically probably hunted and fished together and that that was the exception rather than the norm. But the shared use was at the very least seasonal, and that definitely satisfies the test of aboriginal rights. I'm sorry. Can you point me to the specific language? Do you remember where it is in the findings? If you don't have it now, maybe you can give it to me on rebuttal. I want to focus on exactly what – I remember there was such a finding, but I just can't put my finger on it. Certainly, Your Honor. You may want to – I don't want to cut you off, but you may want to go ahead and deal with other issues. But I would like an answer to this question before you address it. Okay. And to make sure that I respond to that one. Certainly, Your Honor. And I apologize, I don't. No, no, I understand. But you've got court counsel. Maybe they can help you. But just before we're done, I'd like to have a – Absolutely. People in the villages, did they intermarry? Did they intermarry? Did they have social events? They came over here, what, 9,000 years ago? Maybe a few hundred or whatever the number was. When we had the great ice age, we crossed the Bering Sea, probably on foot. I mean, there was one group when they came over. I'm assuming that's what we're told by the scientists. But did they intermarry? Have DNA tests been done? Did they find any markers that mutations or, you know, anything, bring them together? I mean, why aren't they really one people? They are one people, and it's important to note that even in the district court's opinion, they only refer to them as one people. It's also interesting to note that if you look at Exhibits 91 or 357, I believe the court may reference them, or they're at least available in the record. Historically, every single explorer that found them called them the Chugach. No one refers to them as the people of Titlik or the people of Iyak or the people of Chenigo. Most of the Europeans came there were pretty ignorant anyway, and everybody looked the same to them, I'm sure. And they were just out there to get eyes and whatever they could take of that. So, but is there any DNA evidence, any testing, anything like that? No, but there was evidence and testimony, and I believe there is also a finding that all the villages are actually related. I mean, every single person that testified from the villages was related to the others in some way. They literally share a common lineage. There was a time period in the 19th century where they all physically lived in one village called Nucek. Now, that time period, I believe, lasted almost 100 years, and they had consolidated on Nucek, which is the outside of Hinchinbrook Island, which is the entrance to Prince William Sound. But that's not the period we'd be looking at. We're looking at Aboriginal rights, and the fact that they might have come together later is not relevant, except insofar as it might tell us something about past practices, right? But we do seem to have district court findings here. If you look on the same page, where the district court says, this is again page 18 of the findings, page 19 of the excerpts, where the district court finds Prince William Sound villages were widely separated from one another. Travel between them was necessarily by kayak or Yumiak across unprotected waters. Travel from the lower Kenai Peninsula to Prince William Sound was long and dangerous. So, I mean, these findings seem to suggest a separateness that is contrary to the idea of a unified people. I mean, they may all look sort of the same to Europeans, but. I think that the interesting thing is also at record page 13 of the, which is in the Court's opinion, page 12. The other subgroup occupying Prince William Sound on the southwest coast of the Kenai Peninsula was recognized by themselves and others as Chugach. So the Court also recognized that, and as to your point about them being separate, they are, in fact, separated by a significant distance. It would be a challenge for you or I to run a kayak in between those areas. But I think on record page 16. I think in my case, much more than a challenge. Probably a minus law, Your Honor. In page, record page 16, you'll see at the very first sentence of the full paragraph, at contact, the occupants of the Chugach villages. There are two sets of numbers on the pages I'm looking at. Is this 016 or is it? 016, yes, Your Honor. Okay. The bottom number. Okay. Right. The bottom number. I apologize. We probably should have put an R in front of it. I just want to make sure we're on the same page. Okay. At contact, the occupants of the extant Chugach village were excellent marine hunters and fishermen. They were entirely capable of navigating anywhere within Prince William Sound to the lower Kenai Peninsula. And then I won't read the whole sentence, but you see there is the mention that I was fumbling for earlier is Middleton Island was visited regularly, probably seasonally. And it's important to understand when you think about the distances between these villages or the dangerous quality of the waters, as the Court mentions, Middleton Island mentioned here is 60 miles from shore. And this is a round trip that was so fascinating to the National Park Service that they undertook a detailed study to figure out if this was humanly possible and how people  would be able to navigate this area. And I believe that's Exhibit 5. And it's also in your record is a gentleman named Bill Mitchell said this took 48 hours, a round trip of 250 miles. Now, the villages would be 30 to 50 miles apart, the two that are the farthest apart. And so if they're doing something that's 250 miles on a regular basis, I don't think necessarily we can infer that 30 miles was something terribly prohibitive to them. Counsel, help me on a statutory point that concerns me. ANILCA had as one of its purposes the preservation of a subsistence way of life for rural residents on public lands in Alaska. The Supreme Court said in Alaska meant within Alaska, not on the Outer Continental Shelf. Now, the Alaska Native Claims Settlement Act says all aboriginal titles, if any, and claims of aboriginal titles in Alaska based on use and occupancy, including submerged land underneath all water areas, both inland and offshore, and including any aboriginal hunting and fishing rights, are hereby extinguished. Now, your argument, central to it, is saying in Alaska in ANCA means the same thing as in Alaska in ANILCA. But I have trouble seeing why that should be so. The reason why is ANILCA was preserving certain rights, not for aboriginal peoples, but for rural residents in Alaska, and the Supreme Court's interpretation of what in Alaska meant restricted the rural residents' rights. It's claimed from the very broad language used in ANCA that it was meant to be a very broad extinction of aboriginal rights, and it uses this phrase both inland and offshore, and it doesn't limit offshore to the three-mile limit. It would seem to mean as far offshore as you want to go, because that would appear to be consistent with the purpose, aboriginal rights extinguished, 40 million acres of land and a billion dollars in exchange. I don't see, when I look at those two statutes together and consider their declarations of purposes and declaration of settlement, why in Alaska should mean the same thing in both. I think there are two answers to that. The first is that in the AMICO case, which was one of the intervening Supreme Court appeals in the Gamble series of cases, in interpreting in Alaska. That's the one that I mentioned. The second is that in the AMICO case, which is one of the intervening Supreme Court appeals in Alaska, in interpreting in Alaska, the state of Alaska, the state of Alaska is the one that's the same for both. They remand back for consideration of the ANILCA issue in light of their opinion. And so I inferred that that means when we say in Alaska, we mean it the same for both. But I think also there is a discussion of this point that you raise in one of the Gamble cases, and I think it's two off the top of my head, where the government had made the same argument. Kennedy, you have a Ninth Circuit Gamble case.  I apologize, Your Honor. You don't mean the Supreme Court decision. Right. And we're sitting on bonk. So if our discussion is mistaken, we can correct it. You can, yes. And what was interesting in that case is that that court, the Gamble II court, the Ninth Circuit. The Supreme Court decision interpreted in Alaska under ANILCA, not accident, never mentioned what it meant in ANCSA, and it interpreted it to limit rural resident subsistence rights. Is my recollection correct on that, Incidentally? I think that that is the gist of it. But I think the extended discussion of the relationship between the two statutes was the following. That Congress recognized in extinguishing through ANCSA the aboriginal rights, they were going to have to find some means for people to be able to continue hunting and fishing. But they didn't in ANILCA. An Alaska native who lives in Fairbanks has no subsistence preference under ANILCA. That's correct, Your Honor. And a white who came to Alaska a year ago and lives all day's snow machine ride out of Emonic does have subsistence preference. That was one of the ANILCA was intended to preserve aboriginal rights, and the compromise made was that Congress felt it would be inappropriate to only protect people living in rural areas who happened to be native. So instead of calling it a native or aboriginal preference, they made it a rural preference to make sure they weren't excluding anybody who, whether they were native or not, needed to live off the land by virtue of where they were located. I do believe the statutes are extremely closely tied. And in fact, the 10-year gap between them is a recognition of the fact that in the interim, the Secretary had said, it's okay if you extinguish aboriginal rights because we're going to regulate all that and protect subsistence hunting and fishing in Alaska. And that they did not do. And that's why ANILCA resulted in 1981, was to reestablish what they thought the Secretary was going to do de facto after the passage of ANILCA. But a descendant of one of these tribes that you're describing, he'd be likely to live in Anchorage now or maybe Kenai, has no subsistence preference at all under ANILCA. Many of the descendants do actually still live in the five villages. Ms. Landreth, if I understand your claim correctly, your claim is limited to aboriginal rights for hunting and fishing. Is that correct? That is correct, Your Honor. So we're not talking about leases of underlying seabeds or claims to mineral rights? No. And as a matter of fact, I think in footnote 34, the district court opinion, they basically say, this entire case, just to make sure we're clear, has focused on hunting and fishing rights. That's how it's been briefed. That's how the relief is described. And if we are to grant you the relief that you're requesting, what you want us to do is to essentially vacate the Secretary's IFQ regulations and send it back for a redetermination of what the rights of the villages would be to individual fishing quota permits. And you're asking for one per village. Is that correct? We are asking that the district court's opinion be overturned and that it be remanded through the district court to the Secretary to probably issue a new regulation to accommodate the rights of these five villages. We are not at all asking that the program be disassembled, that it be vacated. The program itself actually needs to be vacated. But you want to share the catch is really what you're asking for. That's right. That's right, Your Honor. And it would be for these five villages only. So you want one permit per village? Most likely that's how it would be administered. And the Magnuson-Stevens Act provides the guiding criteria for how there to do that. And there would probably be two most pertinent. And one is, I believe, in Midwater Trawlers, Justice Thomas described the best available science as how they would be guided by that. And then the last prong under that section is that they have to look at the what's needed to sustain the fishing community. So they have their criteria already set forth. What's permissible now under the current regulation? There's a 20-fish-per-day-per-person exemption, right? Just for subsistence, Your Honor. So that's something that you could either keep or give to somebody else. So that's per villager, right? That's per subsistence fisherman and individual. But it wouldn't include the other rights that we've described here, which is your right to do as you have done, to live off of your hunting and fishing and to subsist. So you're asking for commercial rights? Commercial rights, sure. There's a distinction, is there not, between subsistence hunting and fishing and commercial fishing? Well, it would all be included because the aboriginal right has never separated out subsistence as a lesser or separate right. Because trade in the fish was part of the historical fishing. That's right, because there was always an economy. I'm sorry, Your Honor. I just stepped on your word. How many fishing boats are there, at least permits that were allocated, that went to the native Alaskans? How many did they get? I don't believe that's in the record. I think there were a handful maybe that went to the five villages in this case, and the way that happens is if you happen to be the line that was drawn is if you happen to be wealthy enough to own a boat, but if you used someone else's boat or you went with somebody else to engage jointly in any of your hunting and fishing, you were left out. And I see that I'm now reminded of that. What was the purpose of that three-year period? Well, the – they were told to take into account the historical dependence on the fishery. And the agency interpreted historical dependence to be 88 to 90. Now, they have to draw the line somewhere, but it's important to understand what happened in 89 and 90. 1989 was the Exxon Valdez oil spill. So most of the people who would have otherwise been fishing, and there was testimony to this effect. They were cleaning up the spill. That's right. And they certainly wouldn't eat the food that came out of the ocean. And so the impact on them as uniquely serving as stewards of Prince William Sound impacted their ability to go ahead and apply for IFQs if they indeed wanted to do that. I'm sorry. I'm down to my time. May I reserve the rest? Okay. We'll hear from both sides. Thank you, Your Honor. May it please the Court. I am David Shilton, representing the Secretary of Commerce. With me at council table is Demian Shane from the General Counsel's Office of the National Oceanic and Atmospheric Administration. I plan today to first address the adequacy of the district court's findings of fact, and then I plan to discuss whether, as a legal matter, claims of aboriginal rights can exist on ocean areas overlying the Outer Continental Shelf, or OCS. The district court here did carry out the remand instructions by rendering findings of fact on the trial record. I think that what the plaintiffs have tried to do here is pick out just a few of those factual findings, rather out of context, and to argue that those require a finding in their favor. But I think that approach simply doesn't work. Didn't the district court ignore our remand order? No. It did not. Why in the remand order did it tell the district court to make conclusions of law? It said to decide whether the native villages have aboriginal rights, if any, and to what extent. And so I think in deciding the remand order was pretty clear. It told the district court to engage in some fact-finding and to assume, for the purpose of that fact-finding, that there was no impediment vis-a-vis paramount C or any other doctrine, just to whether they could establish factually that they had exclusive use of the shelf during pre-contact periods. It's pretty clear, isn't it? Well, the district court clearly did that. It made findings of fact. It also ---- And it went on and made conclusions of law, didn't it? It did. But if it was improper for it to ---- Where in the remand order did we tell the district court to make conclusions of law? I think it's implicit in remanding to decide a question. It was not explicit. It was not explicit to do conclusions of law. But I think the district court was trying to put this case in a position where it could be wrapped up after all these many years by making sure that there was a finding or conclusion on all of the various issues that had been raised. So the district court decided we didn't know what we were doing, that it would tell the circuit court what the law was. No. I think it was trying to be as helpful as it could by providing you with the findings of fact that you had expected, plus giving its views on several legal issues that had been floating through the case all along. This was not a full remand. This was a limited remand. It had one exclusive purpose, make some factual findings. Well, if the conclusions of law were beyond the scope of the remand, this Court can simply ignore them and decide the case on the basis of the findings of fact, which are proper, which are not disputed, is clearly erroneous here, and were made under the proper legal test. The parties have agreed all along that the legal test is that the plaintiffs have the burden of showing actual continuous and exclusive use and occupancy. Is that the same test for non-exclusive use, which is the basis of their claim? It is the test for their theory of non-exclusive use. Their theory of non-exclusive use is that it's based on aboriginal use and occupancy and that it gives them the right to all the fish and hunting resources in the area, whether they use those during prehistoric times or not. And that is a right which can only be based on aboriginal title. So it's an aboriginal title type of theory that they are bringing. It's not a theory like in Village of Gamble v. Hodel, Gamble III, which was simply to be protected from interference from subsistence uses. This case is about much more than just subsistence uses. Let me ask you this, if I could. Is there any dispute or was there any dispute in the evidence presented to the district court? That is to say, we have findings of fact in the district court's order, of course, but sometimes you've got findings of fact and they're necessary because Witness A says one thing, Witness B says something that contradicts what Witness A said. Is there a conflict in the evidence being presented to the district court? I think so. There were different – both sides had experts. They took somewhat different views. The district court had to decide which experts were more credible. And basically what the district court said on that was that, you know, all of these experts are relying on the work of Burkitt Smith and De La Guna, who were – It's all coming out of the same historical record. It was. But the experts had different takes on how to interpret that. Yeah, what I'm interested in is not getting behind the findings of fact to the degree that there may be different takes or some disagreements among the experts, but sometimes, particularly in an order that's – an awful lot of testimony and the order's not very long with respect to the findings of fact, whether there may be issues – there may be questions in the record or statements in the record as to which there's no disagreement but as to which the district judge just didn't say anything. Well, I think there were probably some of those as well. There wasn't any need for findings of fact. But there were – Let me follow on Judge Fletcher's question. I'd like to read to you from page 13 of the blue brief. It's the first full paragraph. And this is what your opponents say. Expert anthropologists on both sides also agreed that there is no evidence that any native group besides the Chugach fished or hunted on the shelf waters at issue during the pre-contact period than they cite to the record of testimony of Ganley, Langdon, and Woolley. Is that statement accurate? No, because there is the same sort of evidence of fishing by other non-Chugach groups as there is for fishing by the Chugach themselves, which is that it's inferred if people are traveling across these ocean areas that if they have an opportunity, they'll take a of hunting or fishing expeditions on the EEZ by any of the native groups. And so the district court's finding that more likely or not than not there was probably some limited fishing is based on that inference, that if you're out there, you may fish. Well, that applies to the Konyé, to the Tlingit, anybody who would have been going through this area. And no one was excluded from this area. What expert testified that the Chugach use of the shelf during pre-contact was not exclusive? Well, the government's experts, Michael Yarborough and Woolley and also Linda Yarborough, all agreed that these were open areas, the ocean areas were open to all for trade, for warfare, that it was impossible to exclude people from those areas. But that's a different point. The point is what did the evidence show about who actually used the areas, not whether it was open to all, but which groups actually used the areas for fishing and hunting? Well, I think the question is did the villagers have the ability to exclude others? That's been the test in aboriginal title cases for decades. And these witnesses that I've mentioned pointed out that the villages were very small, maybe 100 or 200 people. They had subsistence territories right around the village that they would have defended, but they had no ability to exclude people from the ocean areas that none of the villages would have had. And that, in fact, the plaintiffs at page 17 of their reply brief, I think, agreed that if the relevant unit is the village, that they really can't show exclusion. But their argument has been the relevant landowning entity is the Chugach as a group. I thought the issue was whether or not there was exclusive use by the villages. And I thought Joe Hopkins asked me was there any evidence that anyone other than the villages used the area for fishing. And there is. And the district court made a finding on that. And this is in the... This is at 021. Let me ask you this. I have a copy of the district court's opinion. I don't have zeros. I've just got 1, 2, 3, 4, 5. Sorry. It's page 20 of the opinion and 021 of the excerpt. And it's down at the bottom where he's talking about the foregoing areas. And these are areas... What line? Let me get to it. Sorry. Page 20. He includes in those areas the Copper River Delta and Copper River Flats. I'm sorry. Where are you reading on the page? Where are you reading? Okay. This is the bottom of the page starting with Moorover. Okay. About a third of the way down, the line that starts were too few areas in the Moorover. Go ahead. Some of the OCS areas in question, in particular Lower Cook Inlet, the area between the Barren Islands and Kodiak Island, and the Copper River Delta and Copper River Flats, were on the periphery of the Chugach territory. That is, the foregoing are the areas where the Chugach villagers met up with the Dena'ina, Koniak, and Eeyak. And more likely than not, these areas were fished and hunted on a seasonal basis by all of the Koniak, the Chugach, the Eeyak, and the Tlingit. Now, while he's talking here about areas on the periphery, actually the Copper River Flats are an important part of the area that's being claimed here. This is inferentialism. I think we're all saying the same thing. There's no direct evidence of use by other tribes. That was a deduction made inferentially by geography, right? Can you say yes or no? Yes. The same inference as for the Chugach fishing on the Outer Continental Shelf. There's no direct evidence of fishing. It's just assumed that it would happen because we know they were traveling. You just have a lot of guesswork here. Necessarily in a historic case like this, but nonetheless, the burden is still on the plaintiffs to show. Let me ask you this, though, as to burden of proof. Don't you bear the burden of proof on a narrow question of non-exclusivity? No. The cases are clear that the Indians trying to prove aboriginal use or aboriginal rights have the burden on all of the issues, including exclusivity. But who's in a better position to prove non-exclusivity, the government or the tribes? I don't think either is in a better position. Everybody has the same access to the historical record and to experts. But if you look at the Court of Claims and Indian Claims Commission decisions on exclusivity issues, look at cases, for instance, like the Strong case. Well, you know, we just learned, you know, in the past couple of decades about the migration of people out of the Rift Valley. Are you acquainted with all that? You know how people migrated out of the Rift Valley when you had the big ice age? Do you know about that? And how they came up after thousands of years, you know, and then crossed the Bering Straits, a group of people? Yes. And we have records of that in people's blood, in their DNA. We know a lot. The government, a lot of this stuff's in the Smithsonian. You know, they publish all this. So how can you say that these people in the villages have got better access to information than the government has? Not better. Just I'm saying the same sort of access to information. But the burden is the burden of proof is still there. Well, but is it? I mean, this is the factual issue that the trier of fact has to decide. Who has exclusive versus non-exclusive use? And we have two findings of fact. One on page 20 of the court's opinion in the first paragraph at the top, the last sentence. The court finds that there were huge portions of the OCS being claimed by plaintiffs, which residents of the ancestral villages seldom, if ever, visited. And then we've got another finding of fact on 21 at the bottom of the top paragraph in the page, that none of the ancestral villages was in a position to occupy or exercise exclusive control over any part of the OCS on a sustained basis. And nobody's challenging those findings of fact, are they? That's correct. No, and the travel was out to specific areas. It was out to Middleton Island, where you go to collect bird's eggs. But let's take Middleton Island. One of the problems is we've got these red lines that look like they encompass a triangle, but in fact those are tidal borne because of the fact that to get to Middleton Island, you ride with the tide straight down, but you can't row against the tide coming back, so you have to go way to the east and then north in order to get back, right? That's absolutely right. And that sort of evidence doesn't establish aboriginal title because it's not evidence that you're able to exclude anybody. It's simply that you're traveling to these areas, and the Tlingit and the Koniag also travel to Middleton Island. But I thought the plaintiffs did challenge that. They challenged that as being an impermissible basis for making the exclusivity ruling because the fact that the numbers are small cannot be the determining factor as to whether there was exclusive use. They do challenge that, and we're not saying that small numbers is absolutely determinative. We're saying that it's relevant, and the court of claims cases find that it is relevant if there are not enough people to exclude others from the area that you're claiming, then that's going to be a piece of evidence that's important, and the district court here did make a claim. But that was not definitively stated by any of the experts, that they were unable to exclude others from fishing or hunting in the area. Was that definitively stated by the experts? Yes, yes. Our experts, Wooley and Michael Yarborough and Linda Yarborough, did state that these villages would not have been able to exclude people from areas. It's only because of the numbers. It's only because of the small number of people, not as a matter of fact. Well, that's one piece of evidence leading to that conclusion. The other piece of evidence is that other tribes did travel to Middleton Island, that the Koniag, there was evidence from Burkitt Smith that the Koniag traveled into Prince William Sound itself and allied themselves with two of the Chugach villages against the third Chugach village on one occasion. So it's they simply weren't able to exclude folks from the ocean, and that's just the nature of oceans. Let me, if I can. I have two questions. One's raised by our recent discussion, and the other is statutory. The one that's raised by our discussion is, I don't recall the blue brief saying that the findings of fact or any of them were clearly erroneous. That's correct. The way I recall is there was an argument about this or that part of the background, but was there an argument that the findings were clearly erroneous? No such argument. Okay. Now, my other question is, on the statutory issue, how do you propose to deal with the Ninth Circuit opinion that interprets the various statutes and the Supreme Court opinions to mean this is one of the native village of gamble opinions, as I recall, that in Alaska means the same thing in both statutes? How should we address that? We think, and we have taken the position that that decision is incorrect, and as an in-bank court, this court could reach a different conclusion, and I would point the court towards the court's initial village of gamble opinion, village of gamble one, which was village of gamble versus Clark, which we think correctly and very thoroughly look at the Alaska Native Plains Settlement Act and find that the intent was to extinguish all Native Plains. So what we would have to do to go your way is we would have to overrule gamble, I think it's three. Yes, gamble three, which is gamble versus Hodel. The gamble versus Clark case was vacated by the Supreme Court when it went up and sent back down. That's all kind of speculative, too. I mean, when you start dealing with intent and all that fiction that's out there. But how many Chugash people from the native villages were given individual fishing quota permits? I'd like to know that. My answer would be the same as the plaintiffs, a handful. I don't know the exact number. Do you ever think about it, ever look into it? No. I don't think that's important. Not in the record. No, because the plaintiff's claim is that that's basically irrelevant and that they have a property entitlement to each village. Well, what they're asking for is the ability to get a permit so they can do some commercial fishing. Isn't that what they're asking for? Right. Along with the other people that are doing that. Right. In other words, they like to share in the bounty of nature. Right. Now, they can commercially fish now on the same basis as everyone else, which is to- But they don't have the permits. Well, you can buy a permit. Yeah, you can buy them. If you've got a lot of money, where are you going to get the money? So there are other ways you can fish, of course, for Halibut. You can do subsistence fishing 20 fish a day. Yeah. Well, what if they don't want to just live on the subsistence basis? That is definitely the nature of the claim. Our point is that to establish that sort of property right to a share of the fish, one, it has to have a factual basis, which isn't here, and two, that those claims, if they're on ocean areas, are borrowed. Why were we limited to that three-year period when they were cleaning up the mess from Exxon Valdez? Well, first of all- And these people were trying to clean up the waters that were mucking up their villages where they were fishing. First of all, the three-year period started in 1988, which was a year before the Exxon Valdez, and all you had to do during those three years was to land some fish commercially. And then if you landed fish commercially during any of those three years, then you could actually go back to 1984 and show your best year of commercial landings, and your quota would be based on that. But did these people know that those restrictions were going to come into effect in 91? No. No, they didn't know it, so- But it was- I mean, that's basically a challenge to the regulations as arbitrary- But the IFQ system, those who've been fishing, get the IFQ permits now that we're instituting a permit system, and then there's an exception. Even if you don't have an IFQ permit, you can do subsistence fishing, take 27 a day. Right. Right. And that IFQ system was upheld as not being arbitrary and capricious in this Court's decision in the alliance against IFQ decision. And so I don't think that sort of arbitrary and capricious challenge is- As I recall, just your ordinary little silvers, not even with kings running, they're about, oh, 17 to 20 pounds. So 20 of them would be 340 pounds or more. Yeah, halibut are really large. Halibut, I'm sorry. Right. Yeah. So that is a lot of fish. But I think I would encourage this Court to look at the legal issues. I realize that the remand was to look at the facts, and that was done. But we strongly feel that federal paramountcy would bar these sorts of claims, even if the factual case had been made. And I'm concerned that if the case were decided just on the factual basis, that it might encourage others to try and make a- who felt they had a stronger factual case to come forward. In fact, we think these claims are barred by federal paramountcy, and that this Court's decision in Village of E Act I, that the rationale of that decision applies with full force here. But there's no question about the ability of the federal government to extinguish any aboriginal rights of the sort that are contended for here. The question really is whether they have been extinguished. And it seems to me on the paramountcy doctrine, you say because of the doctrine, without any other evidence of any statutory abrogation or whatever, even if there were aboriginal rights, they're gone. I don't see how you get there from here. The paramountcy rights, that's an argument between the federal government and the states. That's not an argument between the federal government and the tribes. It is because it's an argument about whether any property rights can exist. But if you read the I Act I decision, the one that you're arguing in favor, it clearly states it runs through all the cases, and every one of those cases is federal government versus state. And then it says by analogy or we see no difference, we'll also apply it to the tribal aboriginal rights. Am I wrong about that? That's correct, because on the OCS, property rights have to coalesce in the federal government. But what I'm asking about, it sounds to me as though your argument is, if the paramountcy doctrine applies, even if there are aboriginal rights, they are automatically extinguished without any expression by Congress of an intent to abrogate them. Isn't that the consequence of your decision, of your argument? In 1867, when America purchased this area and it came under the sovereignty of the United States, then all claims to the OCS, including Indian claims that were claims to property, that that property had to coalesce in the national sovereign. And I understand that. But what I'm after is as to what the sovereign, what the federal sovereign must do to extinguish those claims. I think your argument is that there is this paramountcy doctrine, which means that we need no expression from Congress in an intent to abrogate. That's correct. There doesn't need to be a separate act of extinguishment. Well, what then becomes a – doesn't that mean that there are no aboriginal rights unless we have an explicit recognition of such rights by Congress? Absolutely. That stands Indian law on its head. Well, the explicit recognition of those rights occurs in treaties. And we have treaties, such as in the state of Washington, which agree that those tribes can continue to fish at their usual accustomed grounds. If those grounds are out in the ocean, they can continue to do that because the federal government has decided to recognize that right to fish at those usual and accustomed grounds. But if you don't have a treaty or statute, then claims to have aboriginal rights in the OCS are barred as being inconsistent with federal law. Let's say we don't follow you there. I'm not saying we won't. I'm just saying let's say we don't follow you there and we say whatever aboriginal rights existed are, in fact, not extinguished. Would those aboriginal rights extend beyond subsistence fishing, which I – as I read in the district court's record, is that that's essentially the rights they exercise? Well, yes. Their claim is much broader than subsistence fishing. I understand that. But the – whatever aboriginal rights they had, they wouldn't have more rights now. If they weren't extinguished, wouldn't they be limited to whatever those rights were? If these rights exist, yes, our argument would be that they would be limited to the traditional way. But I would stop and disagree with that. The last time this case was argued, the question was asked of the plaintiffs whether their aboriginal rights would extend to minerals such as oil and gas under the Outer Continental Shelf beyond the three-mile limit. And I believe the plaintiffs answered yes. This morning, I believe they answered no when Judge Tallman asked them about the same thing. I wonder, has something changed or is all you need a right – a property right to the usufruct of fish and seals and sea otters and whatnot, and then you can stop oil and gas from being extracted? What's the story of that? Well, their brief says all resources. They have not claimed mineral resources in this case, but in the original Village of Eyak 1 case, they did. That claim was originally thrown out by the District Court just on grounds of ripeness because there was no oil and gas sale that was going to happen in Lower Cook Inlet. But, you know, I would be certainly concerned that if it were held, that it's possible to get these types of rights, that we would see claims to mineral rights. That's why I asked the question. But I've got a follow-on. If the District Court was right that federal paramounts extinguished the aboriginal rights by 1950, how can you explain the action in 1953 when Congress enacted the Outer Continental Shelf Lands Act that it considered the effect on the rights in the OCS acquired through the Doctrine of Discovery? Well, the Outer Continental Shelf Lands Act was concerned with the shelf, not with fishing at all. And so Congress there was only focusing on the shelf. And in the provision of the OCSLA, which preserved any existing rights acquired by persons under U.S. law, it was referring to the fact that people had gotten lease rights to the shelf out there. But there was no focus on fishing rights in the OCSLA. And the mere reference to the Doctrine of Discovery does not imply that Congress was saying, you know, we're recognizing aboriginal rights. It just wouldn't follow. It was Judge Holland's view prior to the in-bank proceedings that, irrespective of historical pre-contact use, that federal paramountcy and the application of the statutes we've been talking about meant that the tribes could never establish aboriginal rights. Isn't that correct? That's correct. And did his view change? No. He repeats that. So he put that in the original order. It came up in bank. And we sent it back saying, ignore for the moment federal paramountcy and the statutes and just conduct fact-finding, determine whether these tribes had exclusive use during the pre-contact period. Correct? Correct. And then he went on, despite what the order said, to say what his original view was, which was because of paramountcy and the statutes, that they could never establish these rights. Isn't that correct? Yes. And I think Judge Holland's concern was that if he didn't decide all of the issues, fewer than all of the issues, that there might be an appealability problem. He wanted to avoid that. You told us that. But, I mean, his fact findings were based largely on experts that testified and on certain documents that were introduced into evidence and all that. Did he say that any of the witnesses were not credible? He did say that the most credible witnesses were, in fact, the two who weren't there, Burkitt Smith and Dale Aguna. They were in there in the 30s. But I think the critical point is there's no indication at all that his conclusions of law influenced his findings of fact. Well, sure. Sure. And did the government submit any proposed findings of fact and conclusions of law? Both sides did, yes. You did. And he took yours, right? No. His are quite different than. No, but the government, you submitted the conclusions of law to him, didn't you? I would have to go back and check on that. I think we did. And you submitted findings of fact as well. Right. He accepted some of our conclusions, rejected others. Did this copy? When I read them, it sounded, frankly, like Judge Holland talking, so I assumed it came from a dictating machine. Did he copy findings that you submitted or are these his own? No, these are his own. And, you know, on some things we disagree, but these are his own findings. And if you look at the trial transcript and the record, it's very apparent he really dug in to the facts. He actively questioned the witnesses. It was very engaged. I kind of ignored the conclusions of law because I thought, well, we review them de novo, so they don't really matter. It's just the findings that I was paying attention to, and it sounded like Judge Holland. But you didn't write those? No. Okay. Thank you. Thank you. I'd like to try and make six points, including having a more complete answer to Judge Kleinfeld's question and a record cite for Chief Judge Kaczynski. But first what I'd like to do is to direct the Court to record page 200. We just heard an extended discussion about whether or not there was evidence that other people used the area. This is a question by Mr. DeBoto. I was talking about the OCS, and just to be very clear, you're not aware of any evidence that other groups besides the Chugach were fishing or hunting in the OCS in any of the relevant portions of the OCS during a pre-contact period? Answer by defendant's expert, Mr. Yarborough, no. Page 205 of the record. But you're not challenging the findings of facts. It sounds to me like you're arguing that the facts are wrong based on the answer by the defense expert. No. We want to make it clear. We're not challenging the findings of facts, and we think it's really important that there is no finding in the district court's opinion that other people used the area. And we want to make it clear to this Court that there are at least two record cites. The other is at page 205. Well, I'm sorry. I thought there was. Yeah. I mean, that's pretty clear that they said that. Page 21. 21, yeah. The section that's being described as what's called the periphery of the Chugach territory, that's exactly where our territory ends and the neighboring territories begin. Now, the section where the periphery of the Barren Islands is where the Cognac people would meet up. The section of the Copper River Delta would be where the Tlingit people meet up. So naturally, at the periphery of any territory, there would be mixed use, and those are not an issue. They're outside of the claim area in this case. And that's why we think. So you didn't challenge the findings of fact, because in your view, the findings of fact support the position that the villages had fishing rights. That's exactly right. There is no finding that anyone else used, and we believe the findings of fact are sufficient to meet that. It's not unusual in Indian Claims Commission decisions to see maybe three pages of findings,  But counsel, I don't understand your position in the face of the actual language. I'm looking page 21, the sentence I read to you before. None of the ancestral villages was in a position to occupy or exercise exclusive control over any part of the OCS on a sustained basis. We believe that what he's interpreting that there is your ability to sort of police the waters or control the boundaries or Which is the basis for exclusive use and occupancy. In the sense that the United States can't control its borders, I think is our point. I don't think it's the same thing. I think it's I didn't mean to make light of your point, Your Honor. Counsel, I don't think it's the same thing. I think this non-exclusive occasional use to be described, it sounds like an American and an Englishman needed a café in Istanbul, and that doesn't mean that they can plant an American or an English flag in Istanbul and claim it for their own country. He says the Chugach, it's a broad designation of a people like the European people, who probably all look alike to aboriginals of other areas, but they're different among themselves. And he says these Chugach, it's a bunch of villages different from among themselves. They often fight with each other. They don't regard themselves as all one people. They don't have one leadership. So if two kayaks meet on the outer continental shelf, it's like the American and the Englishman at the Istanbul café. I think it's important to remember in this case, it's pretty similar to a case called Seminole. The government made a similar argument and the court at the trial level bought a similar argument. There are too few of you to control this large area that you're claiming. That's the problem the American and the Englishman have in Istanbul. And the issue there was the court found that 2,500 people, as many as are probably in one shopping mall on any given day, held aboriginal title to the entire state of Florida. Let me ask you this question. I quoted from your brief at page 13 to your opposing counsel about exclusivity in the sense of they were the only ones who used it. You cite Ganley, Langdon, and Woolley. The government says that, in response to my question, said that Yarborough, Lindegard, and Woolley, I guess, said to the contrary. First of all, do you agree with that? No, I don't. And I believe the two record sites that we've given, 200 and 205, are Langdon and Woolley saying. My other question is, is there any place in the findings of fact, let's assume that counsel for the government is correct, that these experts are at war with each other on this issue of exclusivity. Is there any place in the findings of fact where Judge Holland analyzed it and said why he was accepting one point of view as opposed to the other? No. And I think the reason is what you just heard from counsel here is that they were unanimous that there was no direct evidence. They're asking, they asked the court there, they're mentioning it again today, to infer use by other groups who may have traveled there. But there simply was no evidence of it. There wasn't conflicting evidence on that point. So I think I would like to, if I may, respond to, Judge Kleinfeld had asked me a question about these two statutes being harmonized, and I'd like to at least provide you with a precise cite, if I may be, about the relationship between the two. And as it was discussed in, this is Gamble I, and I'm looking at 746F2D at page 580 where the Ninth Circuit engages in a discussion about how the two were related. And since I have so little time, I won't try and walk you through that. I apologize. The cites for seasonal use, Chief Judge Kuczynski asked about are on page 16 and 21. And the cases have consistently held that that is enough use, because that's simply how Indian people live. I'm going to say 16, this has 16 of the exceptions. 16 of the record, yes, and 21 of the record. And the last point that I want to make. You didn't let me finish what I was asking. I'm sorry, Your Honor. Please. What does the record mean? Is it 16 of the findings? Is it 16 of the records? Oh, page 16 of the record, Your Honor. The findings? 016. 016. Yes. I'm sorry. So that's page 15 of the findings, right? Yes. And this is what I read earlier. Middleton Island was visited regularly, probably seasonally. And then you go to 02. I'm sorry. Where are you reading on that page? From in the middle of the page, Your Honor. Middleton Island was visited regularly, probably seasonally. And then the Court goes into a description of how they achieved that. And then if you go to 021, the first full paragraph that begins in the middle of the page, residents of the ancestral villages made some use probably seasonal. Counsel, can I just ask you one question about your position? Yes. Is it your position that we can accept all of the findings here and decide this case in your favor without any remand on anything? Absolutely. We think the findings are sufficient. And there's one more important point about that. We are not asking you to overrule E-Act I. And I think it's really important to outline the distinction in the opinion by Judge O'Scanlan is very helpful here. What people had raised was an aboriginal right, and that you always prove the same way. The relief in that case was very different, not just exclusive versus non-exclusive. But in that case, what had been requested was exclusive use, and I'm quoting, regulatory power over third parties, including officials of the executive branch of the government. We're not asking for that. And so we no longer think that that decision needs to be overruled. What we're asking for here is to participate in this fishery in a way that recognizes the right of a people who have been there for an incredibly long time, and we think you can do that. Commercial fish? They had commercial fishing as aboriginal rights? Yes. As a matter of fact, the very first account, I believe you'll find it at the end of your record. The exhibit site was 357. One of the first encounters was, we'll trade you some of the talibit that we just caught incredibly far from shore for some of your looking glasses and silver spoons. But your findings, that's out of the conference, which you're not challenging. Well, I think what's important to understand also is as well that this Court has the opportunity, not necessarily to make findings to the province of the district court, to draw inferences from those facts. If the Court feels the need to look into any of that, we did find we did file proposed facts, which are separated by category of all the parts of the test at docket number 234-2, not to take into account our conclusions on the facts, but at least to direct you to the parts of the record that answer that question. And I see my time is up. I apologize. I've run over. Thank you. Page 5, U.S. Census. We're adjourned.
judges: Kozinski, Schroeder, Pregerson, Kleinfeld, Hawkins, Thomas, Fletcher, Paez, Tallman, Rawlinson, Clifton